No. 26-3085

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellant

v.

LIEUTENANT GOVERNOR AND SECRETARY OF STATE OF NEW JERSEY,
Defendant-Appellee

LEAGUE OF WOMEN VOTERS OF NEW JERSEY, LATINO ACTION NETWORK, MAUNGSAI SOMBOON,
NATIONAL ASS'N FOR THE ADVANCEMENT OF COLORED PEOPLE, NAACP NEW JERSEY STATE CONFERENCE, SALVATION AND SOCIAL JUSTICE, AAPI NEW JERSEY, RETURNING CITIZENS SUPPORT GROUP, ASS'N OF BLACK WOMEN LAWYERS OF NEW JERSEY, GARDEN STATE BAR ASS'N, NEW JERSEY MUSLIM LAWYERS ASS'N, PEOPLES ORGANIZATION FOR PROGRESS, EDWIN ORTIZ,
Defendants Intervenors-Appellees

MAKE THE ROAD NEW JERSEY, JAMIE Y DING, DANIELLE LITWAK,
Defendants Intervenors-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

*(See inside cover for continuation of cover page)*

*(continuation of cover page)*

BRIEF FOR THE UNITED STATES AS APPELLANT

HARMEET K. DHILLON
Assistant Attorney General

ERIC A. SELL
Deputy Assistant Attorney General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
J. KATIE NEFF
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(771) 333-0019

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 2

STATEMENT OF THE ISSUES .......... 3

STATEMENT OF RELATED CASES AND PROCEEDINGS .......... 4

STATEMENT OF THE CASE .......... 4

A. Statutory Overview .......... 4

B. The Department of Justice Requests Voter Lists from New Jersey .......... 7

C. Procedural History .......... 11

SUMMARY OF THE ARGUMENT .......... 13

STANDARD OF REVIEW .......... 15

ARGUMENT

I. New Jersey's statewide voter registration list is a voting record under the Civil Rights Act. .......... 16

A. The district court's holding conflicts with Title III's plain text .......... 17

B. There is no conflict between Title III and the list maintenance requirements of HAVA. .......... 28

C. The district court's interpretation of Section 301 would lead to absurd results. .......... 30

**TABLE OF CONTENTS (continued):** **PAGE**


II. The DOJ's demand amply satisfied the CRA's basis and purpose requirements. .......... 32

A. Defendants may not challenge the predicates for the basis and purpose for the DOJ's demand. .......... 32

B. The DOJ's demand stated an adequate basis.......... 37

C. The DOJ's stated purpose of ascertaining New Jersey's compliance with the NVRA and HAVA was sufficient. .......... 41

D. The Secretary's scope-of-production arguments are no basis to reject the DOJ's demand. .......... 49

III. The DOJ's demand for an electronic, unredacted copy of New Jersey's SVRL does not violate federal or state privacy laws.......... 51

A. The Attorney General's demand complied with the Privacy Act.......... 52

B. The Attorney General's demand complied with the E-Government Act.......... 53

C. The Driver's Privacy Protection Act does not allow the Secretary to deny the DOJ list maintenance data. .......... 57

D. Federal law preempts any contrary New Jersey privacy law. .......... 58

E. The DOJ's demand *protects* the fundamental right to vote.......... 60

CONCLUSION .......... 63

**TABLE OF CONTENTS (continued):**

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:** **PAGE**

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960),
*aff'd sub nom. Dinkens v. Attorney General of the U.S.*,
285 F.2d 430 (5th Cir. 1961) .......... 33

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .......... 60

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 16

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021) .......... 40, 43, 61

*Bryan v. United States*, 524 U.S. 184 (1998) .......... 30

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) .......... 60

*Cablevision of Bos., Inc. v. Public Improvement Comm'n*,
184 F.3d 88 (1st Cir. 1999) .......... 43

*Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963) (per curiam) .......... 44

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) .......... 59-60

*Dean v. United States,* 556 U.S. 568 (2009) .......... 44

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024) .......... 46

*Doe v. Chao*, 540 U.S. 614 (2004) .......... 52

**CASES (continued): PAGE**

*Donaldson v. United States*, 400 U.S. 517 (1971), *superseded by statute on other grounds*, Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520 .......... 35-36

*Electronic Privacy Info. Ctr. v. United States Dep't of Com.*, 356 F. Supp. 3d 85 (D.D.C.), *vacated and remanded on other grounds*, 928 F.3d 95 (D.C. Cir. 2019) .......... 55-56

*Ex Parte Siebold*, 100 U.S. 371 (1879) .......... 59

*Fischer v. United States*, 603 U.S. 480 (2024) .......... 29

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), *superseded by statute on other grounds*, Family Smoking Prevention and Tobacco Control Act of 2009, Pub. L. No. 111-31, 123 Stat. 1776 .......... 45

*Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019) .......... 18

*Foster v. Love*, 522 U.S. 67 (1997) .......... 59

*Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916 (11th Cir. 2023) .......... 19

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) .......... 43

*Heckler v. Chaney*, 470 U.S. 821 (1985) .......... 36

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962) .......... 33

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) .......... *passim*

*Kennedy v. Lewis*, 325 F.2d 210 (5th Cir. 1963) (per curiam) .......... 50-51

*Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018) .......... 18

**CASES (continued):** **PAGE**


*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) .................... 18

*McIntyre v. Morgan*, 624 F. Supp. 658 (S.D. Ind. 1985) .......................... 18

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014) .......................................................................... 43

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
587 U.S. 601 (2019) .......................................................................... 46

*POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014) ................. 47

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .......................................................................... 30

*Reno v. Condon*, 528 U.S. 141 (2000) ...................................................... 57

*Reynolds v. Sims*, 377 U.S. 533 (1964) .................................................... 40

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) .............................. 4-6

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012) ....................... 55

*United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich.),
*aff'd*, 179 F.4th 470, *reh'g en banc denied*, No. 26-1225,
2026 WL 2364306 (6th Cir. Aug. 14, 2026) ............................ *passim*

*United States v. Comley*, 890 F.2d 539 (1st Cir. 1989) ...................... 48-49

*United States v. Fausto*, 484 U.S. 439 (1988) ......................................... 45

*United States v. Lynd*, 301 F.2d 818 (5th Cir. 1962) ......................... 34-35

*United States v. McAnlis*, 721 F.2d 334 (11th Cir. 1983) ....................... 51

*United States v. Mississippi*, 380 U.S. 128 (1965) .................................. 18

**CASES (continued):** **PAGE**

*United States Dep't of Just. v. Tax Analysts*, 492 U.S. 136 (1989) ........ 20

*Uronis v. Cabot Oil & Gas Corp.*, 49 F.4th 263 (3d Cir. 2022) ........ 15, 48

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025) ........ 29

*Webster v. Doe*, 486 U.S. 592 (1988) ........ 36

**CONSTITUTION:**

U.S. Const. Art. I, § 4, Cl. 1 ........ 58

U.S. Const. Art. VI, Cl. 2 ........ 60

**STATUTES:**

Civil Rights Act of 1960 (CRA)
52 U.S.C. 20701 *et seq.* ........ 1, 5
52 U.S.C. 20701 ........ *passim*
52 U.S.C. 20702 ........ 28-30
52 U.S.C. 20701-20706 ........ 44
52 U.S.C. 20703 ........ *passim*
52 U.S.C. 20704 ........ 5-6, 10
52 U.S.C. 20705 ........ 6, 12, 17
Pub. L. No. 86-449, § 601, 74 Stat. 90 ........ 44

Civil Rights Act of 1964
42 U.S.C. 2000e-5(b) ........ 39

Drivers' Privacy Protection Act
18 U.S.C. 2721 et seq. ........ 57
18 U.S.C. 2721(a) ........ 57
18 U.S.C. 2721(b)(1) ........ 57-58
18 U.S.C. 2721(c) ........ 57
18 U.S.C. 2725(1) ........ 57

**STATUTES (continued): PAGE**

18 U.S.C. 2725(3)-(4) ........ 57

E-Government Act of 2002
44 U.S.C. 3501 note ........ 53
44 U.S.C. 3502 ........ 54
44 U.S.C. 3502(3)(A)(i) ........ 54, 56
44 U.S.C. 3502(3)(B) ........ 55
44 U.S.C. 3502(10) ........ 54
44 U.S.C. 3518(c)(1) ........ 55
44 U.S.C. 3518(c)(1)(B) ........ 55
§ 201 ........ 54-55
§ 208(b)(1)(A)(ii) ........ 53, 55, 57
§ 208(b)(1)(B)(i) ........ 53-55
Pub. L. No. 107-347, 116 Stat. 2899 ........ 53

Fair Housing Act
42 U.S.C. 3610(a)(1)(B)(iv) ........ 39

Help America Vote Act of 2002 (HAVA)
52 U.S.C. 20901 *et seq.* ........ 2
52 U.S.C. 21083(a) ........ 56
52 U.S.C. 21083(a)(1)(A) ........ 7, 50, 56
52 U.S.C. 21083(a)(1)(A)(i) ........ 31
52 U.S.C. 21083(a)(1)(A)(ii) ........ 31
52 U.S.C. 21083(a)(1)(A)(iv) ........ 31
52 U.S.C. 21083(a)(1)(A)(vi) ........ 31
52 U.S.C. 21083(a)(1)(A)(viii) ........ 30-31
52 U.S.C. 21083(a)(2)(A) ........ 7
52 U.S.C. 21083(a)(5)(A)(i)-(ii) ........ 7
52 U.S.C. 21083(a)(5)(A)(iii) ........ 7
52 U.S.C. 21111 ........ 45, 58
Pub. L. No. 107-252, 116 Stat. 1666 (2002) ........ 42

National Voter Registration Act of 1993 (NVRA)
52 U.S.C. 20501 *et seq.* ........ 2
52 U.S.C. 20501(a)(3) ........ 42

**STATUTES (continued):** **PAGE**

52 U.S.C. 20501(b)(3) ........................................ 6
52 U.S.C. 20507(a)(4)(A)-(B) ........................................ 6
52 U.S.C. 20507(i)(1) ........................................ 6, 8
52 U.S.C. 20510(a) ........................................ 45, 58

Privacy Act of 1974
5 U.S.C. 552a(e)(4) ........................................ 52
Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896 ........................................ 52

The Equal Pay Act
29 U.S.C. 211(a) ........................................ 39-40

Voting Rights Act of 1965
52 U.S.C. 10101 ........................................ 31, 44

8 U.S.C. 1445(f) ........................................ 25

8 U.S.C. 1449 ........................................ 25

8 U.S.C. 1454(a) ........................................ 24-25

10 U.S.C. 130c(d)(2)(C) ........................................ 23

13 U.S.C. 214 ........................................ 23

26 U.S.C. 7602(a) (1954 ed.) ........................................ 35

26 U.S.C. 7604(a) (1954 ed.) ........................................ 35

28 U.S.C. 1291 ........................................ 3

28 U.S.C. 1331 ........................................ 2

28 U.S.C. 1343 ........................................ 2

30 U.S.C. 1732(b) ........................................ 23

**STATUTES (continued):** **PAGE**

31 U.S.C. 5314(a) .......... 54

44 U.S.C. 3572(f) .......... 23

44 U.S.C. 3601 .......... 55-56

N.J. Stat. Ann. § 47:1A-5.3(b) .......... 10

**REGULATIONS:**

28 C.F.R. 0.50(a) .......... 53

68 Fed. Reg. 47,610 (Aug. 11, 2003) .......... 52-53

70 Fed. Reg. 43,904 (July 29, 2005) .......... 52

82 Fed. Reg. 24,147 (May 25, 2017) .......... 52

**LEGISLATIVE HISTORY:**

106 Cong. Rec. 7767 (1960) .......... 44

*Civil Rights—1959: Hearings Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 86th Cong., 1st Sess. (1959) .......... 48

**RULES:**

Fed. R. App. P.
2 .......... 64
41(b) .......... 64

**MISCELLANEOUS:**

1 New Shorter Oxford English Dictionary (4th ed. 1993) .......... 19

**MISCELLANEOUS (continued):** **PAGE**

Authority to Obtain & Share Statewide Voter Roll Data,
50 Op. O.L.C.,
https://www.justice.gov/olc/media/1440346/dl ....................19-20, 55

Black's Law Dictionary (4th ed. 1951)....................................................22

Electronic Registration Information Center, About ERIC (2026),
https://ericstates.org/about/ ..........................................................61

National Highway Traffic Safety Admin., National Driver Register
Frequently Asked Questions, August 2020,
https://tinyurl.com/3ea7359x ........................................................62

*Merriam-Webster's Collegiate Dictionary* (10th ed. 2002) ......................56

Report of the United States Commission on Civil Rights (1959),
https://www.usccr.gov/files/historical/1959/
59-001-U.pdf)..............................................................25-26, 51

*The American Heritage College Dictionary* (4th ed. 2002) .....................56

*The Oxford Universal Dictionary* (3d ed. 1955) .....................................19

U.S. Dep't of Just., Civil Rights Division, Voting Section,
https://www.justice.gov/crt/voting-section
(last visited Aug. 3, 2026) ...............................................................53

U.S. Election Assistance Comm'n, About the EAC,
http://eac.gov/about (last visited Sept. 9, 2026) ...............................7

U.S. Election Assistance Comm'n,
*Celebrating 20 Years of HAVA*,
https://www.eac.gov/sites/default/files/HelpAmerica
VoteDay/HAVA_1-Pager_10-27 22_508.pdf.............................42-43

**MISCELLANEOUS (continued):** **PAGE**

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* (June 2025), https://tinyurl.com/38xb38tx ........................................................ 8

*Webster's New World Dictionary of the American Language* (8th coll. ed. 1960) ........................................................ 19

*Webster's Third New International Dictionary* (1966 ed. unabridg.) ........................................................ 23

## INTRODUCTION

In July 2026, New Jersey acknowledged that more than 6600 ineligible noncitizens had been added to the Statewide Voter Registration List (SVRL), and that roughly 400 of them voted illegally. Doc. 100.[1] Every illegal ballot cancels a lawful one. To the eligible voter, that is the same as being stripped of the franchise.

In defense of that franchise, the United States Department of Justice (DOJ or Department) brought this case against New Jersey Lieutenant Governor and Secretary of State Dr. Dale G. Caldwell[2] (the Secretary) alleging, *inter alia*, that he violated Title III of the Civil Rights Act of 1960 (CRA), 52 U.S.C. 20701 *et seq.*, which entitles the federal government to demand certain records pertaining to elections for federal office. Specifically, the DOJ alleged that the Secretary violated the CRA

---

[1] "JA__" refers to page numbers in the Joint Appendix filed with this brief. "Doc. __, at __" refers to documents filed in the district court and the internal page number, No. 3:26cv2025 (D.N.J.).

[2] The DOJ made its demand for New Jersey's SVRL to then-New Jersey Lieutenant Governor and Secretary of State Tahesha Way. Doc. 50-4, at 1-2. Way was succeeded by Dr. Dale Caldwell in January 2026. Because the Secretary's position on disclosing the SVRL did not change (Doc. 50-1, at 11), this Brief refers to both as the Secretary for the convenience of this Court.

by refusing the Attorney General's written demand for an electronic, unredacted copy of New Jersey's SVRL to determine the State's compliance with the National Voter Registration Act (NVRA), 52 U.S.C. 20501 *et seq*. and the Help America Vote Act of 2002 (HAVA), 52 U.S.C. 20901 *et seq*.

The district court granted the Secretary's and intervenors' (collectively, defendants) Motions to Dismiss the DOJ's Title III claim and denied the United States' Motion to Compel Production, concluding that the SVRL is not a record or paper that Title III requires New Jersey to retain and preserve and to produce upon the DOJ's written demand. *See* 52 U.S.C. 20701. This was error. The SVRL is a "record" under Title III because it is "relat[ed] to" the act of registering to vote in a federal election. *Ibid*. Accordingly, this Court should reverse the district court's Judgment and remand with instructions for the district court to order the Secretary to produce the requested SVRL.

## STATEMENT OF JURISDICTION

This appeal is from a final judgment in a civil case. The district court had jurisdiction under 28 U.S.C. 1331 and 1343. That court entered an Opinion (JA1-17), and separate Order (JA18), granting defendants'

Motions to Dismiss and denying as moot the United States' Motion to Compel Production on July 29, 2026. The United States filed a timely Notice of Appeal. JA19-21. This Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

1. Whether New Jersey's SVRL is a record or paper that Title III of the CRA requires the State to retain and preserve and to produce upon the Attorney General's written demand. Doc. 50-1, at 15-24; Doc. 57-1, at 1-2; JA14-17.

2. Whether the DOJ adequately stated the basis and purpose of its demand for an electronic, unredacted copy of New Jersey's SVRL under Title III of the CRA. Doc. 50-1, at 24-37; Doc. 56-1, at 1-9; Doc. 57-1, at 2-8; Doc. 59-1, at 2-5.[3]

3. Whether federal or state privacy laws prevent the DOJ from demanding an electronic, unredacted copy of New Jersey's SVRL. Doc. 50-1, at 38-55; Doc. 57-1, at 8-10; Doc. 59-1, at 5-10.[4]

---

[3] This issue was not ruled upon. *See* JA1-17.

[4] This issue was not ruled upon. *See* JA1-17.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not previously been before this Court. This appeal raises substantially similar issues to those in *United States v. Secretary of State for the Commonwealth of Pennsylvania*, No. 26-2684 (3d Cir.), in which the United States filed its Opening Brief on September 8, 2026; the Sixth Circuit's opinion in *United States v. Benson*, 179 F.4th 470, *reh'g en banc denied*, No. 26-1225, 2026 WL 2364306 (6th Cir. Aug. 14, 2026); and in pending appeals in the First, Second, Fourth, Sixth, Seventh, Eighth, Ninth, Tenth and D.C. Circuits. The United States respectfully requests that this Court coordinate resolution of this appeal with the resolution of the *Pennsylvania* appeal to the extent practicable and appropriate. This case also raises substantially similar issues to *United States v. Albence, et al.*, No. 1:25-cv-1453 (D. Del.).

## STATEMENT OF THE CASE

### A. Statutory Overview

Congress enacted Title III as part of the Civil Rights Act of 1960. The Act's purpose was to strengthen the Civil Rights Act of 1957, which had "authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds." *South*

*Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). To that end, Title III "gave the Attorney General access to local voting records." *Ibid.*; *see* 52 U.S.C. 20701 *et seq*.

Title III requires state election officers to preserve certain documents and produce them to the Attorney General upon his demand. Section 301 requires that "[e]very officer of election . . . retain and preserve, for a period of twenty-two months from the date of any [federal] general, special, or primary election . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701. And the key provision at issue here, Section 303, authorizes the Attorney General or his representative to demand in writing that "the person having custody, possession, or control of such record[s] or paper[s]" make them "available for inspection, reproduction, and copying." 52 U.S.C. 20703. Such demand "shall contain a statement of the basis and the purpose therefor." *Ibid.*

The Attorney General and his representatives are prohibited from disclosing such records or papers except to Congress and its committees, governmental agencies, and in the presentation of a court proceeding. 52

U.S.C. 20704. Should it be necessary to facilitate disclosure, the Attorney General may seek the aid of a district court: "The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

Although Congress enacted the Civil Rights Act, including Title III, with its eyes on "tr[ying] to cope with the problem" of racial discrimination in voting, *Katzenbach*, 383 U.S. at 313, Congress since has enacted additional laws that affect the "records and papers" that are subject to disclosure. 52 U.S.C. 20701. Relevant here are the National Voter Registration Act (NVRA) and the Help America Vote Act (HAVA), which help the federal government ensure that States are overseeing federal elections in a fair and honest manner and "to protect the integrity of the electoral process." 52 U.S.C. 20501(b)(3).

The NVRA's requirements include recordkeeping obligations, 52 U.S.C. 20507(i)(1) and the duty to make reasonable efforts to maintain lists of eligible voters that do not include the names of ineligible voters, 52 U.S.C. 20507(a)(4)(A)-(B). HAVA requires state election officials to

implement a centralized computerized SVRL, and to engage in reasonable efforts to maintain that list by removing ineligible voters. 52 U.S.C. 21083(a)(1)(A) and (a)(2)(A). HAVA also mandates that States may not "accept[] or process[]" an application for voter registration "unless the application includes" particular identifiers—namely, an applicant's "driver's license number" if he or she has one; "the last 4 digits of the applicant's social security number"; or, if the applicant has neither a driver's license nor a social security number, a state-assigned "unique identifying number." 52 U.S.C. 21083(a)(5)(A)(i)-(ii). "The State shall determine whether the information provided by an individual is sufficient to meet the[se] requirements . . . in accordance with State law." 52 U.S.C. 21083(a)(5)(A)(iii).

### B. The Department of Justice Requests Voter Lists from New Jersey

The United States Election Assistance Commission (EAC) is "an independent bipartisan commission whose mission is to help election officials improve the administration of elections and help Americans participate in the voting process." U.S. Election Assistance Comm'n, About the EAC, http://eac.gov/about (last visited Sept. 9, 2026). EAC conducts a biennial Election Administration and Voting Survey (EAVS)

of States. For the 2024 EAVS, States "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance." U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* at iv (June 2025), https://tinyurl.com/38xb38tx.

On July 15, 2025, the DOJ sent a letter (July letter) to the Secretary "to request information regarding the state's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act." JA149. The DOJ requested numerous records, including "[t]he current electronic copy of New Jersey's computerized statewide voter registration list . . . as required by [HAVA]" to "include all fields contained within the list." JA149. The DOJ further explained that "the NVRA requires each state and the District of Columbia to make available for inspection 'all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.'" JA149 (quoting 52 U.S.C. 20507(i)(1)).

In the July letter, the DOJ also raised a litany of voter registration issues raised by New Jersey's 2024 EAVS data. JA150. Specifically, the

DOJ noted that the most recent EAVS report showed that "there are nearly as many active registered voters as the citizen voting age population in New Jersey, with a registration rate of 94.8 percent of the citizen voting age population." JA150. The DOJ also noted that the most recent EAVS report showed that "New Jersey reported that it rejected 348,340 ballots as invalid, which is more than three times the national average." JA150. Next, the DOJ noted that "New Jersey reported that only 417,183 confirmation notices were sent to voters, which is 6.9 percent of all active registered voters and well below the national average of 19.5 percent." JA150. The DOJ also highlighted New Jersey's failure to respond to EAVS report questions that "track the outcome of confirmation notices that were mailed to registrants." JA150. The DOJ letter also discussed the state's abysmal voter registration removal rate, noting that "New Jersey reported that 287,971 voter registration records were removed from the voter registration rolls, which is 4.3 percent of all registered voters and well below the national average of 9.1 percent." JA150. Finally, the DOJ letter noted that "New Jersey reported that 2,866 duplicate voter registration records were removed from the voter registration rolls, which is 1 percent of all removed registration records

and well below the national average of 8.1 percent." JA150. For security purposes, the DOJ requested that the records be sent either by encrypted email or via the Department's secure file-sharing system. JA151.

New Jersey provided the DOJ an electronic copy of the SVRL stripped of the registrants' identifying information, including Social Security numbers, driver license numbers, and non-driver identification numbers. *See* JA161 (citing N.J. Stat. Ann. § 47:1A-5.3(b)). The Department sent the Secretary a second letter dated August 14, 2025 (August letter), reiterating its demand for an electronic copy of New Jersey's "complete and current" SVRL and citing the NVRA, HAVA, and Title III of the CRA as the demand's basis. JA153. The letter further explained that "[t]he purpose of the request is to ascertain New Jersey's compliance with the list maintenance requirements of the NVRA and HAVA." JA153. In response to any federal privacy concerns the Secretary had with the requested information, the DOJ cited Section 304 of the CRA, which precludes, with limited exceptions, the Attorney General, his representatives, and DOJ employees from "disclos[ing] any record or paper . . . or any reproduction or copy" produced pursuant to the DOJ's demand. JA153 (quoting Section 304 of the CRA (52 U.S.C. 20704)).

On January 9, 2026, the New Jersey Attorney General denied the Attorney General's demand for the full, unredacted SVRL, citing privacy concerns. JA155-157.

### C. Procedural History

On February 26, 2026, the DOJ sued the Secretary, alleging, *inter alia*, that the refusal to provide the United States an electronic, unredacted copy of New Jersey's SVRL violated Title III of the CRA. JA49-58. The DOJ also filed a Motion to Compel Production of the SVRL consistent with a summary enforcement proceeding. Doc. 20; JA140-143.

The Secretary and the intervenors-defendants moved to dismiss the DOJ's Complaint under Federal Rule of Civil Procedure 12(b)(6). Docs. 50, 50-1 (Secretary); Docs. 56, 56-1 (NAACP intervenors); Docs. 57, 57-1 (LWVNJ intervenors); Docs. 59, 59-1 (MRNJ intervenors).[5] Defendants argued that (1) the requested SVRL is not subject to production under Title III of the CRA, (2) that the DOJ's statement of

[5] Each group of intervenors consisted of several organizations and individuals. *See* Doc. 56, at 1; Doc. 57, at 1; Doc. 59, at 2. For convenience and brevity, we refer to each group using the name of the first-listed party in their Motions to Dismiss.

the basis and purpose for the demand was insufficient, (3) that the DOJ's demand violated federal and state privacy laws, and (4) that the DOJ's demand violated the constitutional right to vote. Doc. 50-1, at 14-55; Doc. 56, at 1-9; Doc. 57-1, at 1-10; Doc. 59-1, at 2-10.

On July 29, 2026, the district court entered an Opinion and separate Order dismissing the DOJ's Complaint and denying as moot the DOJ's Motion to Compel Production. JA1-18.

As a threshold matter, the district court rejected the United States' argument that its CRA claim should be evaluated in a summary proceeding. JA12-14. The court ruled that though Title III only gives the district court jurisdiction "by appropriate process to compel the production of such record or paper," the court may nonetheless subject the United States to the full machinations of the Federal Rules of Civil Procedure, including discovery, motions practice, and evidentiary hearings. JA12-14 (quoting 52 U.S.C. 20705).

On the merits, the district court held that because the SVRL is a database created by the State, it did not "come into [the Secretary's] possession" and is therefore exempt from the retention and demand requirements of Title III of the Civil Rights Act. JA14-17 (citing 52 U.S.C.

20701). The court did not reach the defendants' other arguments. JA14-17.

## SUMMARY OF THE ARGUMENT

1. The district court erred in dismissing the DOJ's Title III claim on the grounds that the SVRL is not a record or paper subject to Title III's preservation and demand requirements. The CRA's text does not exclude state-generated documents. At most, the distinction between records "com[ing] into [one's] possession" and being "in [one's] possession," is a temporal one—not a distinction between obtaining records from an outside source and through self-generation. Moreover, there is no conflict between the CRA and the list maintenance requirements of the HAVA. Thus, the doctrine of surplusage does not mandate the district court's absurd interpretation of the CRA that rejects plain reading and historical context of the law. Finally, even under the strained interpretation embraced by the district court, the Secretary came into possession of the SVRL when he took office or when his staff prepared the SVRL and provided it to him. Accordingly, under any interpretation, the SVRL is a voting record under the CRA. Accordingly, the DOJ is entitled to

reproduction and copying of New Jersey's SVRL to assess a state's compliance with federal election laws.

2. The district court did not address defendants' arguments that the DOJ failed to provide a proper basis and purpose of its demand for an electronic, unredacted copy of New Jersey's SVRL. However, the DOJ's assertion that it was trying to ascertain New Jersey's compliance with the list maintenance requirements of the NVRA and HAVA sufficiently stated the basis of its demand. This basis was bolstered by the post-briefing admission by the New Jersey Governor that more than 6600 ineligible, noncitizen registrants were on the New Jersey SVRL, including about 400 noncitizens who voted illegally. *See* Doc. 100. Further, the DOJ was not required to allege specific facts to explain why it believed that the NVRA and HAVA may have been violated and why New Jersey's unredacted SVRL was necessary for its investigation. This assertion also sufficiently stated a proper purpose of the DOJ's demand, as the NVRA and HAVA are voting-related statutes.

3. The district court also did not reach the defendants' various privacy-related arguments. These arguments are without merit. The demand did not violate the Privacy Act because the DOJ has an

applicable System of Records Notice. The demand also did not violate the E-Government Act because it did not initiate a new collection of information and so it did not trigger any need for a privacy impact assessment. The demand did not violate the Driver's Privacy Protection Act because it falls squarely within the Act's exception for disclosure for use by any government agency in carrying out its functions, including law enforcement or other regulatory enforcement purposes. The CRA preempts any contrary New Jersey privacy law under the Constitution and Supreme Court precedent. Finally, the DOJ's demand did not violate the right to vote but rather protects that vote.

## STANDARD OF REVIEW

"This Court reviews a district court's order granting a motion to dismiss for failure to state a claim de novo[,] . . . accept[ing] all well-pleaded allegations in the Complaint as true and draw[ing] all reasonable inferences in favor of the non-moving party." *Uronis v. Cabot Oil & Gas Corp.*, 49 F.4th 263, 268 (3d Cir. 2022) (alteration and citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible . . . [such] that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I. New Jersey's statewide voter registration list is a voting record under the Civil Rights Act.

Section 301 of Title III of the CRA imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (*Lynd II*), to "retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. 20701.

Those same records or papers are subject to demand by the Attorney General or his representative. 52 U.S.C. 20703. Section 303 provides the Attorney General with a correspondingly comprehensive power to demand in writing that "the person having custody, possession, or control of such record[s] or paper[s]" make them "available for inspection, reproduction, and copying" so long as the demand "contain[s] a statement of the basis and the purpose therefor." 52 U.S.C. 20703. After that written demand has been made, and the state election officer has rejected it, the Attorney General may seek an order from the federal court

"[with] jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

Notwithstanding the plain language of these provisions, the district court dismissed the DOJ's Title III claim on the ground that New Jersey's SVRL is not a record or paper subject to the retention and preservation requirements of 52 U.S.C. 20701 because it did not "come into [the Secretary's] possession" under 52 U.S.C. 20703. JA14-17. This conclusion was erroneous.

According to the district court, the SVRL is not a covered "record" or "paper" under Title III because it is "a document the State itself created," that does not "come into" election officers' "possession." JA14 (quoting 52 U.S.C. 20701). In the district court's view, the phrase "come into [their] possession" means only those items that come from an external source—in this context, only documents given directly from prospective voters to state election officials. JA14-15. This was error.

### A. The district court's holding conflicts with Title III's plain text.

a. Section 301's "sweeping" retention provision, *Lynd II*, 306 F.2d at 226, applies to "*all* records and papers which come into [an election officer's] possession *relating to* any application, registration, payment of

poll tax, or other act requisite to voting in such election," 52 U.S.C. 20701 (emphasis added). "The ordinary meaning of [the phrase 'relating to'] is a broad one," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992), and typically should be read "expansively," *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018). Applied to Section 301, the phrase expands the type of records to be preserved beyond simply applications, registrations, or receipts for payments. Instead, any record "relating to" one of those activities—or even relating to the catchall "other act requisite to voting"—must be preserved. 52 U.S.C. 20701. Because Title III covers voter registration records, *see United States v. Mississippi* 380 U.S. 128, 134 (1965); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985), it necessarily covers the SVRL as a record that relates to voter registration as well.

Section 301's phrase "come into [their] possession" is similarly far-reaching. When, as here, a statute does not itself define a term, courts "ask what that term's ordinary, contemporary, common meaning was" at the time of enactment. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433-434 (2019) (citation and internal quotation marks omitted). An individual "comes into . . . possession" of a record or document the

moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"); *id.* at 13 (defining "acquire" as "1. to get or gain by one's own efforts or actions. 2. to get possession of; get as one's own"). Said differently, "come into possession" is a broad term that both focuses the inquiry on the *moment* at which possession was obtained and denotes "possession by any means." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 933 (11th Cir. 2023) (Jordan, J., concurring) (discussing that "acquire" has two definitions, one of which is "[c]ome into possession of," which "broadly encompasses possession *by any means*" (alteration in original; emphasis added) (quoting 1 *New Shorter Oxford English Dictionary* 20 (4th ed. 1993))); *see The Oxford Universal Dictionary* 17 (3d ed. 1955) (defining "acquire" similarly). Accordingly, any election officer under Section 301 in possession of a SVRL came into possession of the SVRL at a distinct point in time.

Congress likely used the term "comes into his possession" precisely because it is broad enough to include both voter-generated and state-generated documents. *See* Authority to Obtain and Share Statewide

Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 8-9), https://www.justice.gov/olc/media/1440346/dl (discussing that the phrase "come into" possession "does not carry a requirement that the thing is received from a third party" and that "it is not unusual to say that one comes into possession of a thing that one created oneself"). Indeed, the Supreme Court has demonstrated a similar understanding of the term. In cases under the Freedom of Information Act, the Supreme Court has imposed two requirements for a document to be an agency record: "First, an agency must either *create or obtain* the requested materials," and second, "the materials [must] have *come into the agency's possession* in the legitimate conduct of its official duties" and remain in the agency's possession at the time of a records request. *United States Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144-145 (1989) (emphasis added; citation and internal quotation marks omitted). Thus, the Supreme Court has made clear that an agency record created by the agency can be said to have "come into the agency's possession"—coming into possession of material refers to when and how the possession began. *See id.* at 145.

b. The district court's requirement that election officers receive the relevant records or papers from voters or some other outside source

(JA14-15) is not the most natural reading of the statutory phrase "come into his possession." *See United States v. Benson*, 179 F.4th 470, 485 n.3, 486 n.7 (*Benson II*) (Nalbandian, J., dissenting), *reh'g en banc denied*, No. 26-1225, 2026 WL 2364306 (6th Cir. Aug. 14, 2026) (*Benson III*); *Benson III*, 2026 WL 2364306, at *11 (Thapar, J., dissenting). Election officers in New Jersey acquired the relevant records from individual voters in the course of carrying out their duties. When election officers in New Jersey aggregated individual records into one new, simple record—the SVRL—they acquired that new record and retained it within their control, thus coming into possession of the SVRL. *Benson II*, 179 F.4th at 484.

As Sixth Circuit Justice Thapar explained when urging the en banc review of the issue:

> [W]e can't read "come into . . . possession" in a vacuum. That phrase is tied to the underlying voting records: "all records and papers . . . relating to any application, registration, payment of poll tax, or other act requisite to voting in [an] election." 52 U.S.C. § 20701. And no one disputes that the records used to create the voter file came into [the election official's] possession.

*Benson III*, 2026 WL 2364306, at *13 (Thapar, J., dissenting) (ellipsis in original).

Indeed, the example documents listed in Section 301 necessarily includes government-made records. Section 301 refers to "any application [or] registration." 52 U.S.C. 20701. While an "application" is something created by a potential voter, a "registration" (*i.e.*, the formal approval of an application and the inclusion of the registrant in the voter-registration list) is something created by an election official. *See* Black's Law Dictionary 127 (4th ed. 1951) (defining "registration" as "[r]ecording; inserting in an official register; enrollment, as registration of voters; the act of making a list, catalogue, schedule, or register, particularly of an official character, or of making entries therein"; and as "[a]ny schedule containing a list of voters, the being upon which constitutes a prerequisite to vote").

Contrary to the district court's conclusion, the word "come" cannot create a carve-out for self-generated documents. *See* JA15 (concluding that its interpretation is necessary to prevent the phrase "come into [their] possession" from being surplusage). Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of

the records or documents in the first instance. 52 U.S.C. 20701; *see Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) (defining "come into" as "to enter upon or into possession of: acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or to trigger duties to act based on acquiring information or property *at a particular time*.[6]

Following this focus on the *how* and *when* an individual gains possession of a record or paper, 52 U.S.C. 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision—and then only "for a period of twenty-two months from the date" of that same election. Thus, the phrase "come into his possession" "cabins an election official's liability to documents she received during

[6] *See, e.g.*, 44 U.S.C. 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. 214 (similar); 30 U.S.C. 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received").

her tenure." *Benson II*, 179 F.4th at 487 n.8 (Nalbandian, J., dissenting). The distinction between records "com[ing] into [one's] possession" and being "in[] [one's] possession," then, is a "temporal" one. *Id.* at 486 n.7 (Nalbandian, J., dissenting).

In reaching the contrary conclusion, the district court placed undue emphasis on the fact that Congress could have, but did not, use the phrase "in the possession of." JA14-15 (quoting *United States v. Benson*, 819 F. Supp. 3d 753, 768-769 (W.D. Mich. 2026) (*Benson I*). But the district court dismissed the relevance of a statutory provision that uses variations of both phrases and shows that any distinction between the two is, at most, temporal—not one between self-generated and non-self-generated records.

Section 1454(a) of Title 8 imposes dual obligations: if a certificate of naturalization or declaration of intention is lost, "the applicant or any other person *who shall have*" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who . . . *may come into possession of* it" at a later time must likewise surrender the document. 8 U.S.C. 1454(a) (emphasis added). Thus, the phrase "come into possession" implies a

temporal change in circumstances: someone who "shall [not] have" the document at first but then "come[s] into possession of it" later. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person," 8 U.S.C. 1454(a), create a declaration of intention for a separate declarant. *See* 8 U.S.C. 1445(f), 1449.

c. Context further demonstrates that Congress would not have created such a distinction between documents received from outside sources and those generated by state officers. As Judge Nalbandian has pointed out, one of the practices in the Jim Crow South when Title III was enacted was "the use of 'voucher' systems, whereby municipalities required prospective voters to find registered voters who could vouch for them." *Benson II*, 179 F.4th at 486 (Nalbandian, J., dissenting) (citing Report of the United States Commission on Civil Rights at 93 (1959) (1959 CCR Report), https://www.usccr.gov/files/historical/1959/59-001-U.pdf). "[C]ounty boards of registrars maintained internal indices that tracked the number of times each registered voter 'vouched' for an

applicant." *Ibid.* (citation omitted). These indices would be government-created records, but once an index was "passed . . . up the ladder," the receiving "state official came into possession of the index." *Ibid.*

The indices were critical to the Commission because the state legislatures had passed bills which allowed for the destruction of the registration applications themselves. 1959 CCR Report at 137. These were among the records that the Commission recommended that Congress make available for federal inspection. *Id.* at 137-138. The Commission itself reviewed self-generated records including overall voting registration records for specific counties, noting that at the time, in Macon County, Alabama, "the 1958 voter registration list" showed only 1218 of the 25,784 nonwhite citizens were registered to vote. *Id.* at 75; *see also id.* at 82 (noting evidence of "a list of qualified voters which is brought up to date every 2 years"). The Commission reviewed the "5-year-old official voting list of Bullock County" which showed only five registered black voters in the county. *Id.* at 89. And the Commission gathered evidence of self-generated actions by County registrars, like error corrections on white voter registration applications. *Id.* at 87-88. Now these county tally sheets and county voter registration lists have

been replaced by the self-generated electronic SVRL as required by HAVA.

Consider also the implication of the district court's interpretation. That reading would exclude from the reach of Sections 20701 and 20703 all the most blatant evidence of discrimination—such as internal memoranda and documents showing whether officers accepted a proper application, including the SVRL. *See Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting). That cannot be the case.

d. Even if this Court were to disregard the origin of the records that make up the SVRL, the records nonetheless "c[a]me into" the Secretary's "possession" when the Secretary received it from someone else in their office. *Benson II*, 179 F.4th at 486-487 (Nalbandian, J., dissenting) (brackets in original; citation omitted); *Benson III*, 2026 WL 2364306, at *8-9 (Griffin, J. dissenting); *id.* at *13-14 (Thapar, J., dissenting). As noted previously, Title III imposes an *officer-specific* duty to preserve and produce certain voting-related records coming into his or her possession. The fines and penalties follow the individual state official having possession of those records. *See* 52 U.S.C. 20701.

"As long as even one 'officer[] of election' . . . 'comes into . . . possession' of the voter list, Title III applies." *Benson II*, 179 F.4th at 487 (Nalbandian, J., dissenting) (second ellipsis in original; footnote omitted) (quoting 52 U.S.C. 20701). So even if the Secretary's employees created the SVRL—"and therefore didn't 'come into . . . possession' of the list themselves" under the district court's reading—the Secretary "nonetheless 'c[a]me into . . . possession' of the [SVRL] when [their] employees sent it to [them]." *Ibid.* (first brackets and ellipsis in original) (quoting 52 U.S.C. 20701); *see also Benson III*, 2026 WL 2364306, at *14 (Thapar, J., dissenting). And Secretary Caldwell certainly received the SVRL from then-New Jersey Lieutenant Governor and Secretary of State Tahesha Way in January 2026 when he came into his new role as Lieutenant Governor and Secretary of State. *See* Doc. 50-6 (admitting possession of SVRL by then Secretary Way); *see Benson III*, 2026 WL 2364306, at *9 (Griffin, J., dissenting). Because the most natural reading of Section 303 includes New Jersey's SVRL, the district court erred.

### B. There is no conflict between Title III and the list maintenance requirements of HAVA.

The district court also held that interpreting the CRA to apply to SVRLs would create a conflict between 52 U.S.C. 20702, "which

criminally penalizes any person, whether or not an officer of election, who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701," and the HAVA, which require States to alter computerized VRLs "on a continuous basis to remain compliant" with those statutes. JA16 (alteration, citation and internal quotation marks omitted). Not so.

The district court failed to acknowledge, much less grapple with, the associated words surrounding "alter" in Title III, which illustrate that verb's narrow meaning. In *Fischer v. United States*, 603 U.S. 480 (2024), the Supreme Court interpreted a similarly worded criminal provision and explained that, under the canon of *noscitur a sociis*, each of these words must be understood as "actions that, by their nature, impair the integrity or availability of records, documents, or objects." *Id.* at 490. Performing list maintenance under the HAVA is thus not "alter[ing]" the SVRL at all, 52 U.S.C. 20702; it is, rather, "retain[ing] and preserv[ing]" the SVRL, 52 U.S.C. 20701; *see Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1085 (10th Cir. 2025) (applying similar analysis to the NVRA's obligation that States "maintain" records). The district court's contrary conclusion "contravenes the canon against implied repeal."

*Benson II*, 179 F.4th at 485 (Nalbandian, J., dissenting). Even if the statutes were truly inconsistent, the "specific" list-maintenance requirements in HAVA would merely create "an exception" to the "general" prohibition in Section 20702. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Finally, Section 20702's *willful* mens rea—also ignored by the district court—erases any doubt that list maintenance under HAVA could run afoul of the CRA's ban on altering records. *See Bryan v. United States*, 524 U.S. 184, 191-192 (1998) (citation omitted) ("[I]n order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'").

### C. The district court's interpretation of Section 301 would lead to absurd results.

Construing Title III not to include the SVRL itself would lead to absurd results—namely paralyzing the United States' ability to enforce many federal voting laws. After all, the SVRL is not just *any* record "requisite to voting," 52 U.S.C. 20701, in an election; it is a federally mandated record that "serve[s] as the official voter registration list for the conduct of all elections for Federal office in the State," 52 U.S.C.

21083(a)(1)(A)(viii). Said differently, the SVRL is, since the passage of HAVA, the archetypal record of acts requisite to voting in an election kept by election officials.

HAVA's requirements make clear the SVRL's importance. The SVRL must "serve as the single system for storing and managing the official list of registered voters throughout the State." 52 U.S.C. 21083(a)(1)(A)(i). The SVRL must contain "the name and registration information of every legally registered voter in the State." 52 U.S.C. 21083(a)(1)(A)(ii). The SVRL must be "coordinated with other agency databases within the State," 52 U.S.C. 21083(a)(1)(A)(iv), and "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official." 52 U.S.C. 21083(a)(1)(A)(vi). Absent this record, conducting federal elections is simply not possible.

Consequently, to investigate whether a jurisdiction engages in practices that violate the CRA, Uniformed and Overseas Citizens Absentee Voting Act, NVRA, HAVA, or Voting Rights Act of 1965, 52 U.S.C. 10101 (VRA), for example, the Attorney General needs to examine

both applications to register to vote and the final voting rolls, including the electronic SVRL, to ensure that States properly process registration applications and perform reasonable list maintenance. *See Lynd II*, 306 F.2d at 228. The district court's reading would effectively carve out vast numbers of federal election records, including SVRLs, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Id.* at 226.

## II. The DOJ's demand amply satisfied the CRA's basis and purpose requirements.

As an alternative ground for dismissal of the DOJ's Title III claim, not addressed by the district court, defendants argued that the DOJ's demand for an electronic, unredacted copy of New Jersey's SVRL failed to state a proper basis and purpose, 52 U.S.C. 20703. *See* Doc. 50-1, at 24-38; Doc. 56-1, at 1-9; Doc. 57-1, at 2-8; Doc. 59-1, at 2-5. These arguments are meritless.

### A. Defendants may not challenge the predicates for the basis and purpose for the DOJ's demand.

As a threshold matter, when reviewing the basis and purpose statement under Title III, the proper level of scrutiny is one of

considerable deference to the Attorney General.

Title III creates a "special statutory proceeding." *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962) (*Lynd II*). The DOJ' demand for federal election records under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings," but rather "comparable to the form of a traditional order to show cause, or to produce in aid of an order of an administrative agency." *Ibid.* The Attorney General's authority under Title III is a "purely investigative" one, *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney Gen. of the U.S.*, 285 F.2d 430 (5th Cir. 1961), and that "investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings," *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (citation omitted).

By seeking records required to be maintained under Section 20701 in court under Title III, the DOJ initiated "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd II*, 306 F.2d at 225. Such a proceeding "does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure," but merely "a simple statement by the Attorney General that after a [Section 303] written

demand for inspection of records and papers covered in [Section 301], the person against whom an order for production is sought under [Section 305] has failed or refused to make such papers 'available for inspection, production, and copying.'" *Id.* at 225-226 (quoting 52 U.S.C. 20703).

Title III's "special statutory proceeding" limits how the Attorney General's demand for federal election records may be challenged and reviewed. Under the statute's plain language, "[t]here is no place for any . . . procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd II*, 306 F.2d at 226 (quoting 52 U.S.C. 20703). Accordingly, a state election official responding to the Attorney General's demand for federal election records may not use litigation tools ordinarily available under the Federal Rules of Civil Procedure to challenge "the reasons why the Attorney General considers the records essential." *Ibid.* Nor is "the factual foundation for, or the sufficiency of," this statement "open to judicial review or ascertainment." *Ibid.*; *see United States v. Lynd*, 301 F.2d 818, 822 (5th

Cir. 1962) (*Lynd I*).

The Fifth Circuit's approach to Title III's "summary proceeding[s]," *Lynd II*, 306 F.2d at 226, is consistent with subsequent Supreme Court precedent. In *Donaldson v. United States*, the Court addressed a provision of the Internal Revenue Code that authorized the Secretary of the Treasury, for "the purpose of ascertaining the correctness of any [tax] return or collecting any such liability[,] to summon the person liable for tax[,] or any person having possession, custody, or care of books of account containing [relevant] entries to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry," 400 U.S. 517, 524 (1971) (quoting 26 U.S.C. 7602(a) (1954 ed.)) (ellipses and parentheses omitted), *superseded by statute on other grounds*, Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520. A neighboring provision "grant[ed] the district courts of the United States jurisdiction 'by appropriate process to compel such attendance, testimony, or production.'" *Ibid.* (quoting 26 U.S.C. 7604(a) (1954 ed.)). The Supreme Court observed that, although the Rules of Civil Procedure "have an application to a summons proceeding," they "are not inflexible in this application"; and, moreover, precedent

does not suggest those rules should be used to "impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." *Id.* at 528-529; *see Lynd II*, 306 F.2d at 226 (allowing judicial determination of whether "written demand has been made" and whether the custodian "ha[s] been given reasonable notice . . . of the proceeding").

In sum, so long as the Attorney General has stated in writing the basis and purpose of the demand, Title III is satisfied and the records must be produced. *See* 52 U.S.C. 20703. There is no room for judicial inquiry as to whether the basis and purpose will eventually prove to be substantiated by the records produced by the state election official. Nothing in the statute purports to authorize courts to second-guess or probe the sufficiency or sincerity of the Attorney General's statement. Indeed, the statute provides no meaningful standards that would permit such judicial review. *Cf. Webster v. Doe*, 486 U.S. 592, 599-600 (1988); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The statute identifies only the scope of the "records and papers" that he may demand, 52 U.S.C. 20701, and a requirement that he communicate "the basis and the

purpose" for his request, 52 U.S.C. 20703—not any standard against which to measure his statement of basis and purpose.

**B. The DOJ's demand stated an adequate basis.**

The DOJ's demand for an unredacted copy of New Jersey's SVRL easily satisfied Title III's requirement for a statement of the basis. In its letters to New Jersey, the DOJ made clear that its demand was based on its authority under the CRA to request such records. JA149-154. The DOJ further provided a factual basis by listing out in detail the questionable responses in the state's 2024 EAVS data. JA150. Under any reasonable interpretation of these statements, the basis for the DOJ's written demand is clear—that New Jersey's list maintenance program may violate the NVRA and HAVA—and thus the demand put the Secretary on "reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226.

The Secretary's attempt to reconcile *Lynd II* with his factual-basis requirement is unavailing. Doc. 50-1, at 28. That the United States in that case based its demand for records on "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting

within your jurisdiction," *Lynd II*, 306 F.2d at 229 n.6 (citation omitted), merely shows that a demand may include such information. Notably, though, the cited demand provided no details regarding what this "information" in the Attorney General's possession was. *See ibid.*; *see also id.* at 229 n.5 (noting that the demand in a consolidated case was "substantially in the same words").

Indeed, *Lynd II* expressly provides that "the factual foundation for, or the sufficiency of, the Attorney General's statement of the basis and the purpose contained in the written demand *is not open to judicial review or ascertainment*." 306 F.2d at 226 (emphasis added; citation and internal quotation marks omitted). It is "virtually unreviewable by a federal court." *United States v. Benson*, 179 F.4th 480, 487 (*Benson II*) (Nalbandian, J., dissenting), *reh'g en banc denied*, No. 26-1225, 2026 WL 2364306 (6th Cir. Aug. 14, 2026) (*Benson III*).

Regardless, potential noncompliance with the NVRA and HAVA is an appropriate basis for a Title III demand. In *Benson II*, a divided panel of the Sixth Circuit held that the similar letter to Michigan failed to state a basis for demanding the SVRL. 179 F.4th at 483. The United States sought en banc review, and a majority of the Sixth Circuit concluded the

DOJ satisfied the "basis" component of Title III in a written demand that described "factual concerns with [the State's] voter-registration list" and "identified its purpose to 'assess' the State's 'compliance' with the NVRA's and HAVA's list maintenance requirements." *Benson III*, 2026 WL 2364306, at *3 (Murphy, J., concurring); *see also id.* at *10 (Griffin, J., dissenting); *id.* at *15 (Thapar, J., dissenting).

Title III is far from unique. Other civil rights "investigative tools" give the United States authority to conduct compliance reviews so long as there is minimal evidence of a violation of federal law. For example, the Fair Housing Act requires the Secretary of Housing and Urban Development to investigate all complaints of housing discrimination, even if the complaints lack factual merit (42 U.S.C. 3610(a)(1)(B)(iv)), and Title VII of the Civil Rights Act of 1964 likewise requires the Equal Employment Opportunity Commission to investigate all charges of discrimination that trigger its jurisdiction (42 U.S.C. 2000e-5(b)). Still other statutes give the United States broad authority to conduct compliance reviews, absent any evidence of wrongdoing. The Equal Pay Act, for example, allows the Department of Labor to "investigate and gather data regarding the wages, hours, and other conditions and

practices of employment . . . and may enter and inspect such places and such records [of employment].” 29 U.S.C. 211(a). The DOJ accordingly may obtain “[a]ny record or paper required by section 20701,” as long as it states the “basis” for doing so. 52 U.S.C. 20703. This Court should reject New Jersey’s effort to engraft an extratextual requirement that the provide a basis for concluding that there is a civil-rights violation.

In any case, the DOJ has provided a reason to believe that there might have been a civil-rights violation, namely vote dilution. “[T]he right of suffrage” that the NVRA helps protect “can be denied by a debasement or dilution of the weight of a citizen’s vote just as effectively as by wholly prohibiting the free exercise of the franchise.” *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). By mandating list maintenance, the NVRA and HAVA also protect against fraudulent voting, which “dilute[s] the right of citizens to cast ballots that carry appropriate weight.” *Brnovich v. Democratic Nat’l Comm.*, 594 U.S. 647, 672 (2021). The DOJ provided a factual basis justifying an investigation of whether New Jersey has diluted citizens’ right to vote by (1) failing to remove invalid registrants leading to (a) implausibly high registration rate and (b) an unusually low removal rate; (2) rejecting more than 300,000 ballots as

invalid—more than three times the national average; (3) failing to send an adequate number of confirmation notices to potentially invalid voters; (4) failing to report the outcome of the few confirmation notices it sent; (5) reporting an inexplicable duplicate voter removal rate, suggesting anomalies with New Jersey's process for identifying and addressing duplicate voters. This basis was bolstered by the post-briefing admission by the New Jersey Governor that more than 6600 ineligible, noncitizen registrants were on the New Jersey SVRL, including about 400 noncitizens who voted illegally. Doc. 100.

### C. The DOJ's stated purpose of ascertaining New Jersey's compliance with the NVRA and HAVA was sufficient.

Further, defendants argue that the DOJ's stated purpose to ensure compliance with the NVRA and HAVA was insufficient because the CRA targets the denial of individuals' voting rights and the NVRA and HAVA do not protect individual voting rights. Doc. 50-1, at 30-33; Doc. 56-1, at 1-5; Doc. 57-1, at 4-5; Doc. 59-1, at 3-4. This argument fails for several reasons.

First, ensuring New Jersey's compliance with the NVRA and HAVA *does* relate to individual voting rights, and thus is a proper purpose of the Attorney General's Title III demand for federal election records. By

broadly authorizing the Attorney General to demand election records from States, "[t]he CRA aids the Attorney General in assessing states' compliance with federal election law and protecting voting rights." *United States v. Benson*, 819 F. Supp. 3d 753, 767 (W.D. Mich. 2026) (*Benson I*).

The NVRA was passed based in part on Congress's finding that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation . . . for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. 20501(a)(3).

HAVA, for its part, is a federal election statute aimed at protecting voting rights. The statute "establish[es] minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections." Pub. L. No. 107-252, 116 Stat. 1666 (2002) (preamble). Those minimum standards, including accurate voter lists, were created to "address[] a variety of improvements to voting systems and voter access that were identified following the 2000 election." U.S. Election Assistance Comm'n, *Celebrating 20 Years of HAVA*, https://tinyurl.com/mwsvsjfv (last visited

Sept. 11, 2026). By mandating list maintenance, HAVA also protects against fraudulent voting, which "dilute[s] the right of citizens to cast ballots that carry appropriate weight." *Brnovich*, 594 U.S. at 672. Because both the NVRA and the HAVA are federal election laws that protect voting rights, "the DOJ may use the CRA to investigate possible violations of" either statute. *See Benson I*, 819 F. Supp. 3d at 767.

Second, NAACPs' argument that Title III solely targets voting-related discrimination (Doc. 56-1, at 1) finds no support in the statute itself. Interpreting Title III's coverage "begins and ends with the text," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014), with "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted). "[A] court engaged in the task of statutory interpretation must examine the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language." *Cablevision of Bos., Inc. v. Public Improvement Comm'n*, 184 F.3d 88, 101 (1st Cir. 1999) (citation omitted). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that

Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Dean v. United States*, 556 U.S. 568, 573 (2009) (brackets in original; citation omitted).

Here, no language limiting Title III to violations of individuals' voting rights appears anywhere in the statutory text. *See* 52 U.S.C. 20701-20706. By contrast, Congress made clear elsewhere in the CRA that it intended a remedy to be limited to particular harms—namely, racial discrimination. *See* Pub. L. No. 86-449, § 601, 74 Stat. 90 (1960) (applying Title VI of the CRA to violations of rights "on account of race or color") (52 U.S.C. 10101). The plain text of Title III provides no limitation on the permissible purpose of the Attorney General's demand. It is sufficient that the Attorney General is "investigating possible violations of a Federal statute." *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) (quoting 106 Cong. Rec. 7767 (1960) (statement of Sen. Keating)).

The Secretary and the MRNJ intervenors also suggested below that the absence of a requirement in the NVRA or HAVA that States disclose or make available to the Attorney General their unredacted SVRLs further undermines the DOJ's Title III demand here. Doc. 50-1, at 32

n.14; Doc. 59-1, at 4-5. Not so. As the *Benson I* court correctly observed, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes." 819 F. Supp. 3d at 767. Indeed, the opposite is true: "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), *superseded by statute on other grounds*, Family Smoking Prevention and Tobacco Control Act of 2009, Pub. L. No. 111-31, 123 Stat. 1776, 21 U.S.C. 387a; *see United States v. Fausto*, 484 U.S. 439, 453 (1988) ("Th[e] classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute."). Accordingly, it is appropriate to interpret the CRA and the subsequently enacted the NVRA and HAVA in concert.

As the Secretary acknowledged (Doc. 50-1, at 32 n.14), Congress gave the Attorney General the authority to enforce the NVRA and HAVA. *See* 52 U.S.C. 20510(a) (NVRA), 21111 (HAVA). This enforcement

authority does not operate in a vacuum, separate from the Attorney General's preexisting Title III investigative authority. Said differently, Title III gives the Attorney General investigative powers; the NVRA and HAVA give him enforcement powers. These laws operate in harmony. *See Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63-64 (2024) (citation omitted) (discussing the "strong presumption" that "federal statutes touching on the same topic" "can coexist harmoniously" and a court's duty to "giv[e] effect to both").

Viewed in this light, the lack of a tool for records inspection by the Attorney General in the NVRA and HAVA comparable to 52 U.S.C. 20703 *supports* the DOJ's position. It is implausible that Congress intended for the Attorney General to lack the ability to inspect complete records so pertinent to his enforcement authority under the NVRA and HAVA. Because it is well-settled that "Congress legislates against the backdrop of existing law," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (citation omitted), a better inference is that Congress saw no need to provide an inspection provision for the Attorney General in the later-enacted the NVRA and HAVA, because the CRA provided a pre-existing investigative tool. This interpretation gives effect to the

Supreme Court's directive that when two separate statutes "are complementary and have separate scopes and purposes," the "greater specificity" of one matters only if both "cannot be implemented in full at the same time." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 118 (2014).

Defendants further argued below that New Jersey's full and unredacted SVRL is not relevant or necessary to investigate the State's possible non-compliance with the NVRA and HAVA's list-maintenance requirements. Doc. 50-1, at 41-44; Doc. 56-1, at 5; Doc. 57-1, at 5-6. But the CRA does not leave "open for determination" the "scope of the order to produce insofar as it concerns the nature of the records or papers." *Lynd II*, 306 F.2d at 226. "This is so because the papers and records subject to inspection and demand have been specifically identified by Congress." *Ibid.*

Finally, defendants argued below that the Attorney General's stated purpose for demanding New Jersey's SVRL is pretextual. *See* Doc. 50-1, at 33-38; Doc. 56-1, at 5-9; Doc. 57-1, at 6-8; Doc. 59-1, at 4. Yet, Section 20703 leaves no room for a court to second-guess the stated basis and purpose for the Attorney General's demand. Even if the demand was

judicially reviewable, the district court was required to "accept all well-pleaded allegations in the Complaint as true and draw all reasonable inferences in favor of" the United States. *Uronis v. Cabot Oil & Gas Corp.*, 49 F.4th 263, 268 (3d Cir. 2022) (citation). Under this standard, this Court should reject speculative allegations as to the purpose of the DOJ's request.

The same result follows under this Court's precedents involving administrative subpoenas. *See Benson I*, 819 F. Supp. 3d at 765 ("constru[ing] a request for records under the CRA as a form of administrative subpoena"). This Court has held that a party resisting a subpoena based on claims of "bad faith" must support its assertions by "firm evidence." *United States v. Comley*, 890 F.2d 539, 542 (1st Cir. 1989).[7] "In the absence of firm evidence of bad faith, it is not [this Court's]

[7] Although the United States below analogized a proceeding under the CRA to an administrative-enforcement proceeding, that does not mean that these non-CRA precedents map on exactly to CRA claims; while these precedents leave some room to evaluate pretext, as the Fifth Circuit has explained, the CRA leaves *no* room for evaluating the sufficiency of the Attorney General's asserted purpose. *See* pp. 34-36, *supra*; *see also Civil Rights—1959: Hearings Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 86th Cong., 1st Sess. 191-192 (1959) (statement of Attorney General William P. Rogers) (explaining the need for the power of "production and inspection . . .

role to intrude into the investigative agency's function," and accordingly, "discovery is improper in a summary subpoena enforcement proceeding" "[e]xcept in extraordinary circumstances." *Id.* at 543 (citations omitted).

Defendants' assertions of pretext fall well short of this standard. They relied on the fact of DOJ's demands for SVRL production from numerous States, statements by federal officials that are consistent with a desire to investigate list maintenance, reporting based on hearsay, and commentary on these same assertions by another district court. Doc. 50-1, at 35-37. None of this shows "firm evidence" of pretext. *Comley*, 890 F.2d at 542-543. For the reasons stated above, the DOJ's stated purpose of its demand is sufficient to satisfy the CRA.

### D. The Secretary's scope-of-production arguments are no basis to reject the DOJ's demand.

The Secretary argued below that the DOJ overstepped Title III by demanding "electronic production" of the SVRL. Doc. 50-1, at 48-49. Section 303 requires that a covered record "be made available for inspection, reproduction, and copying at the principal office of [the] custodian." 52 U.S.C. 20703. Nothing in the text of that statute precludes

rather than for the issuance of a subp[o]ena"). The United States invokes these precedents for the sake of argument.

a demand for "reproduction" of the list, *ibid.*, in electronic form—particularly when the SVRL's native form is required by statute to be contained in a "centralized, interactive computerized" format, *see* 52 U.S.C. 21083(a)(1)(A). The Secretary's argument that Section 303 instead establishes the *exclusive* means of production because Congress was concerned about potential federal government interference with "state control over voting records" (Doc. 50-1, at 48 (citation omitted)) is misplaced. The DOJ has not asked for control of the SVRL, and providing a *copy* of the list in electronic format gives the DOJ control over that copy only. Just as providing the DOJ a paper photocopy of a voter registration would not give the DOJ control over the actual voter registration, neither does giving the DOJ an electronic copy of the SVRL provide the DOJ control over the actual SVRL.

The Secretary also argued "the statute requires States to retain only records related to prior federal elections." Doc. 50-1, at 18. Of course, this limitation is not found anywhere in section 20703, the provision authorizing the Attorney General to demand the records. Indeed, the Fifth Circuit considered this very argument posed by Mississippi election officials. *See Kennedy v. Lewis*, 325 F.2d 210, 212 (5th Cir. 1963) (per

curiam). There, the Circuit Court held that Section 20701's retention duty covered records about "subsequent" "elections" and that a contrary view would read "the statute too narrowly." *Ibid.* That interpretation certainly serves Title III's purpose by barring States from destroying records (including rejected applications to register) before an election—as some state laws once permitted. *See* Report of the U.S. Comm'n on Civil Rights, at 95 (1959). These arguments are without merit.

### III. The DOJ's demand for an electronic, unredacted copy of New Jersey's SVRL does not violate federal or state privacy laws.

Defendants also argued below that the DOJ's demand violated three federal privacy laws—the Privacy Act and the E-Government Act, and the Driver's Privacy Protection Act—and New Jersey privacy laws. Doc. 50-1, at 38-55; Doc. 57-1, at 8-10; Doc. 59-1, at 5-10. These arguments fail first and foremost because New Jersey's obligations under Title III are separate from, and not dependent on, the United States' obligations under other federal laws. *See United States v. McAnlis*, 721 F.2d 334, 337 (11th Cir. 1983) (holding that compliance with a provision of the Privacy Act was "not a prerequisite to enforcement of an IRS

summons"). Regardless, the United States is complying with federal privacy laws.

### A. The Attorney General's demand complied with the Privacy Act.

The Privacy Act was designed to "protect the privacy of individuals" through regulation of the "collection, maintenance, use, and dissemination of information" by federal agencies. *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting the Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896).

The Secretary argued below that the DOJ failed to identify a System of Records Notice (SORN) required by the Privacy Act, *see* 5 U.S.C. 552a(e)(4), that covers an unredacted SVRL. *See* Doc. 50-1, at 45-47. Not so. The full list of routine uses for the DOJ's collection of voter information can be found in the SORN titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47,610, 47,611 (Aug. 11, 2003); 70 Fed. Reg. 43,904 (July 29, 2005); and 82 Fed. Reg. 24,147 (May 25, 2017). The SORN states that "[t]he records in the system of records are kept . . . in the ordinary course of fulfilling the responsibility assigned to [the Civil Rights Division] under the provisions of 28 CFR 0.50, 0.51." 68 Fed. Reg. at

47,611. And the cited regulation, in turn, makes clear that the Civil Rights Division is responsible for "[e]nforcement of all Federal statutes affecting civil rights, including those pertaining to elections and voting." 28 C.F.R. 0.50(a). Accordingly, the SORN covers the NVRA, HAVA and the CRA as statutes for routine use.[8]

### B. The Attorney General's demand complied with the E-Government Act.

In the district court, the Secretary argued that because the United States did not allege that it conducted a privacy impact assessment (PIA), the United States had not complied with the E-Government Act. Doc. 50-1, at 47. Pursuant to the E-Government Act, agencies must "conduct a [PIA]" before "initiating a new collection of information" in particular circumstances "if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons." E-Government Act of 2002, Pub. L. No. 107-347, § 208(b)(1)(A)(ii) and (B)(i), 116 Stat. 2899, 2921-2922 (44 U.S.C. 3501 note) (hereinafter cited without

[8] The SORN further identifies the "Civil Rights Division Web page" as a source for "[t]he delegated legal duties and responsibilities of each section" of the Division. 68 Fed. Reg. at 47,611. And the Voting Section's webpage identifies all three statutes prominently and by name. U.S. Dep't of Just., Civil Rights Division, Voting Section, https://www.justice.gov/crt/voting-section (last visited Sept. 11, 2026).

reference to the Statutes at Large or the U.S. Code note). And a "collection of information" is—with certain exclusions noted below—the act of "obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for," as relevant here, "answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons," where a "person" can include a "State." 44 U.S.C. 3502(3)(A)(i) and (10); *see* E-Government Act § 201 (incorporating definitions from 44 U.S.C. 3502 and 3601). The PIA requirement does not apply here for several reasons.

First, the Attorney General has not asked identical questions of nor imposed any reporting requirements on any persons in connection with the Department of Justice's demand for New Jersey's (or any State's) SVRL. E-Government Act § 208(b)(1)(B)(i); *cf.* 31 U.S.C. 5314(a) (mandating that the Secretary of the Treasury require individuals "to keep records, file reports, or keep records and file reports" whenever individuals engage in transactions or maintain relationships with "any person with a foreign financial agency").

Second, a "collection of information" does not include information collected during an investigation like the type the Department is carrying out here. "The term 'collection of information' . . . shall not include a collection of information described under [44 U.S.C. 3518(c)(1)]." 44 U.S.C. 3502(3)(B); *see* E-Government Act § 201. And Section 3518(c)(1)(B), in turn, excludes any collection of information "during the conduct of . . . an . . . investigation involving an agency against specific individuals or entities." 44 U.S.C. 3518(c)(1)(B). The Department's investigation into New Jersey's compliance with the NVRA and HAVA falls squarely within this carve-out. *See* Authority to Obtain & Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 33), https://www.justice.gov/olc/media/1440346/dl.

Third, the Attorney General has not "initiat[ed] a new collection of information." E-Government Act § 208(b)(1)(A)(ii) and (B)(i). "The term 'initiating'" in the E-Government Act "has no statutory . . . definition," *Electronic Privacy Info. Ctr.* (*EPIC*) *v. United States Dep't of Com.*, 356 F. Supp. 3d 85, 87 (D.D.C.), *vacated and remanded on other grounds*, 928 F.3d 95 (D.C. Cir. 2019), nor does the term "new." *See* 44 U.S.C. 3502, 3601. Accordingly, courts give these terms their "ordinary meaning" and

may consult dictionary definitions. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566-568 (2012). "Contemporary dictionaries define 'initiate' as '[t]o begin, commence, enter upon; to introduce, set going, give rise to, originate, 'start' (a course of action, practice, etc.).'" *EPIC*, 356 F. Supp. 3d at 89 (citation omitted; brackets in original) (collecting definitions). The relevant definition of "new" is "[h]aving been made or come into being only a short time ago; recent" or "[n]ever used . . . before now." *The American Heritage College Dictionary* 936 (4th ed. 2002); *see Merriam-Webster's Collegiate Dictionary* 780 (10th ed. 2002) (defining "new" as "having existed or having been made but a short time" or "different from one of the same category that has existed previously").

The demand in this case did not begin any new collection of information. The Attorney General demanded that the Secretary provide the State's SVRL, which the State was required to "define[], maintain[], and administer[] at the State level." 52 U.S.C. 21083(a)(1)(A). Ever since the passage of HAVA, an SVRL must "contain[] the name and registration information of every legally registered voter in the State and assign[] a unique identifier to each legally registered voter in the State." *Ibid.*; *see generally* 52 U.S.C. 21083(a). Seeking information already

maintained by the State due to *pre-existing* "reporting or recordkeeping requirements," 44 U.S.C. 3502(3)(A)(i) (defining "collection of information"), is not the "*initiat*[*ion* of] a *new* collection of information," E-Government Act § 208(b)(1)(A)(ii) (emphasis added). Thus, the DOJ's demand did not run afoul of the E-Government Act.

### C. The Driver's Privacy Protection Act does not allow the Secretary to deny the DOJ list maintenance data.

In the district court, the Secretary argued that the DOJ's demand violated the Drivers' Privacy Protection Act (DPPA), 18 U.S.C. 2721 *et seq.*, which precludes the disclosure of drivers license and social security numbers obtained by the New Jersey Motor Vehicle Commission in connection with a motor vehicle record. Doc. 50-1, at 47-48. Although the DPPA generally prohibits the disclosure of "personal information" obtained by a State DMV in connection with a motor vehicle record, *see* 18 U.S.C. 2721(a) and (c), 2725(1) and (3)-(4), the statute explicitly permits certain governmental uses. Under 18 U.S.C. 2721(b)(1), disclosure is allowed "for use by any government agency . . . in carrying out its functions," including law enforcement or other regulatory enforcement purposes. *See also Reno v. Condon*, 528 U.S. 141, 145 & n.1 (2000) ("The DPPA *permits* DMVs to disclose personal

information from motor vehicle records for a number of purposes," including "for use 'by any government agency . . . in carrying out its functions.'") (quoting 18 U.S.C. 2721(b)(1)).

The DOJ's demand for an electronic, unredacted copy of New Jersey's SVRL falls squarely within this exception. The DOJ is a "government agency . . . carrying out [one of] its functions," 18 U.S.C. 2721(b)(1): assessing and ensuring compliance with federal elections statutes. *See* 52 U.S.C. 20510(a) (enforcing the NVRA); 52 U.S.C. 21111 (enforcing HAVA). In particular, the DOJ is verifying voter registration records and associated list maintenance activities by state and local entities. Under the governmental-function exemption in Section 2721(b)(1), the United States' use of Department of Motor Vehicles-provided information is permissible, even though the information originates from a motor vehicle record.

### D. Federal law preempts any contrary New Jersey privacy law.

New Jersey argued that federal election laws do not require violation of its state privacy laws. Doc. 50-1, at 38-44. Similarly, MRNJ intervenors claimed that "[n]either the NVRA nor HAVA preempt New Jersey's privacy protections either." Doc. 59-1, at 6.

While States possess constitutional authority over the conduct of federal elections, Congress can override those state choices. U.S. Const. Art. I, § 4, Cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections . . . but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Id.* at 69 (brackets in original) (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)).

A "state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000). Conflict preemption applies both "where it is impossible for a private party to comply with both state and federal law" and where "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 372-373 (brackets in original; citation omitted). Whether a state law poses a

sufficient obstacle to implicate preemption is determined "by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* at 373. A state law that "undermines the intended purpose and 'natural effect'" of federal law is preempted. *Ibid.*

The United States is entitled under federal law to compel and inspect New Jersey's unredacted SVRLs. To the extent that state law prohibits New Jersey from complying with the DOJ's demands—as defendants insist (*see* Doc. 50-13, at 2; Doc. 59-1, at 5-6)—that state law must yield. *See* U.S. Const. Art. VI, Cl. 2; *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15 (2013) ("States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it 'terminates according to federal law.'") (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)).

### E. The DOJ's demand *protects* the fundamental right to vote.

Finally, LWVNJ intervenors argued that the privacy concerns implicated by the DOJ's CRA demand "would impose a significant burden on [voters'] fundamental right to vote" by allegedly chilling the interest in registering to vote if the registrant's private identifying information

were disclosed to the federal government. Doc. 57-1, at 8-10. Yet, by ensuring compliance with federal election laws meant to protect the right to vote, the DOJ's demand likewise protects the right to vote.

Indeed, properly maintained voter registration lists reduce election fraud by allowing election authorities to determine in advance that a person satisfies eligibility requirements for voting. Moreover, the use of a voter registration list allows election officials to keep track of who has cast a ballot and who has not, making it harder for a single person to cast multiple ballots. The Supreme Court has recognized that invalid votes can "dilute the right of citizens to cast ballots that carry appropriate weight." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021). In a two-party system, an invalid vote for one candidate effectively cancels a valid vote for the opposing candidate, and thus it denies voting rights just as surely as the exclusion of a valid voter from the registration list would deny voting rights. Thus, properly maintained voter registration lists protect voting rights.

The defendants' privacy concerns strain credulity. New Jersey elections officials have already freely handed over voters' private identifying information to nonpublic third-party organizations. *See*

Electronic Registration Information Center, About ERIC (2026) https://ericstates.org/about/ (last visited Sept. 11, 2026).

And the defendants fail to explain how a voter would feel any greater chilling effect from the federal government receiving his or her identifying information when the voter is required to share that information with the state and local government to register in the first place. Particularly when the United States is already in possession of much of the identifying information withheld by New Jersey. Indeed, the United States *creates* Social Security Numbers and issues them. The United States maintains many New Jersey driver's license numbers in the National Driver Register maintained by the National Highway Traffic Safety Administration. *See* National Highway Traffic Safety Admin., National Driver Register Frequently Asked Questions, August 2020, https://tinyurl.com/3ea7359x.

What the United States seeks—and what New Jersey hopes to conceal—is the connection of that identifying information to a voter registration. This is exactly the information needed to ensure compliance with the NVRA and HAVA and, ultimately, to prevent the unlawful

registration of 6600 ineligible noncitizen voters. The defendants' privacy concerns are unfounded.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's Order dismissing the DOJ's Title III claim and remand with instructions to order New Jersey to immediately produce the requested unredacted SVRL. This Court should make clear that Title III of the CRA authorizes the United States to demand from a State an electronic, unredacted copy of its SVRL to determine the State's compliance with the NVRA and HAVA, as set forth above.

Further, because the district court's final order has deprived the DOJ of the "prompt and expeditious inspection" that is required under Title III, the "mandate of this Court sh[ould] issue forthwith." *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962); *see* Fed. R. App. P. 2, 41(b).

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

ERIC A. SELL
Deputy Assistant Attorney General

s/ J. Katie Neff
ANDREW G. BRANIFF
DAVID N. GOLDMAN
J. KATIE NEFF
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(771) 333-0019

Date: September 14, 2026

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rules 28.3(d) and 46.1(a), I hereby certify that I am exempt from the Third Circuit's bar admission requirement as I am a federal government attorney and Counsel for the United States in this appeal.

s/ J. Katie Neff
J. KATIE NEFF
Attorney

Date: September 14, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because the brief contains 12,659 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365. I further certify that a virus detection program, Crowdstrike (Version 7.39.21108.0.0), has been run on the electronic brief, and that no viruses were detected.

s/ J. Katie Neff
J. KATIE NEFF
Attorney

Date: September 14, 2026

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 31.1(b)(1), (b)(3), and (c), I certify that on September 14, 2026, I electronically filed this brief using the Appellate CM/ECF system for the United States Court of Appeals for the Third Circuit, that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system, and that seven paper copies, identical to the brief filed electronically, were sent to the Clerk of the Court by Federal Express.

s/ J. Katie Neff
J. KATIE NEFF
Attorney

Date: September 14, 2026